**CITY OF DALLAS, Appellant,**

v.

**E. P. HALLUM et al., Appellees.**

**No. 14982.**

Court of Civil Appeals of Texas. Dallas.

Oct. 21, 1955.

Rehearing Denied Jan. 6, 1956.

H. P. Kucera, City Atty., and Jon H. Shurette, Asst. City Atty., Dallas, for appellant.

McKool & Bader, Dallas, for appellees.

YOUNG, Justice.

The record plainly reflects reversible error in this: Admission by the court, over appellant's objection, of facts concerning the closing of a portion of South Lamar Street and loss of flow of traffic, in proof of damages resulting to the remainder of their property (defendants' witness Knapp attributing the sum of $13,500 to such cause and Cowley, about $12,000); said closing of street occurring more than two years after the 1951 taking and constituting a wholly improper element of recoverable damage. A further résumé of the litigation from its inception is in order (appellant having been required to first proceed with the evidence on account of defendants' election to contest the City's right to condemn).

In October 1951 appellant had initiated this proceeding by filing of statement in writing, with request for appointment of Commissioners, etc.; the involved strip of land being for widening of Wall Street, running along the entire east 178 feet of the Hallum property, 7.28 feet in width at north end and 16.76 feet on the south. In due course, the Commissioners appointed, after public hearing, fixed their award at $3,500 as market value of the strip taken and all damages to the remainder; the landowners joining issue by filing objections to the award on November 16; Order of Possession following on November 20, with deposit of money (amount of award) in registry of the court on November 27—such becoming the date for determination of market values of the sub-

ject property. The widening of Wall Street and relocation of same as South Lamar for several blocks was merely incident to elimination of the Santa Fe Grade crossing on old South Lamar, which project was later completed; as evidenced by City Ordinance of March 29, 1954 reading in part: "Whereas, the City of Dallas in connection with the removal' of the T & N O Tracks from the Central Expressway has been required to provide an alternate route whereby the T & N O Railway Company could reach its freight yards, and in order to accomplish that purpose, it is necessary to close the hereinafter described portion of Lamar Street so as to accommodate the tracks of the various railroads; and, Whereas, the City of Dallas has caused to be constructed underpasses at St. George Street, Harwood Street and Wall Street and is now engaged in constructing an underpass at Ervay Street, so that the streets mentioned above now underpass the tracks of the Santa Fe Railway Company and the T & N O Railway Company; and, Whereas, it is the opinion of the Council that that portion of Lamar Street hereinafter more fully described by metes and bounds should not be allowed to remain open by reason of the grade crossing of the railroads, because it would constitute a hazard to life and property and the Wall Street underpass was provided as a means of travel in lieu of the present grade crossing at Lamar Street; and, Whereas, the City Council is further of the opinion that the physical closing of Lamar Street at the points hereinafter indicated will benefit the public at large, to say nothing of the traffic hazard that will be eliminated thereby; Now, Therefore, * * *."

Above basic facts were in the background of appellant's second and third points, arguing error of the trial court in admitting, over objection, certain testimony on part of Messrs. Cole, Knapp and Cowley, witnesses for Hallum and wife, in connection with the closing of Lamar Street at the Santa Fe tracks and consequent diversion of traffic, *as an element of damage* to the remainder of the Hallum property "when the closing of Lamar Street was not a part of this condemnation proceeding but a separate and independent act of the City, which occurred more than two years after the date of taking on November 27, 1951, and said Court has no jurisdiction to award damages for said closing in this condemnation suit or any other suit in this Court." These witnesses had testified on direct examination of damages to remainder of the property as follows: Cole, $24,000; Knapp, $17,250; and Cowley, $16,250. I quote from their testimony in part on cross-examination: "Q. (By Mr. Shurette) Mr. Cole what are some of the things you took into consideration in arriving at the value of $30,630 being the value of this property after the taking? A. Well, before the taking, I feel that it would have been easy to negotiate a long term lease on that property there for six hundred a month, and the way we appraise restaurants and cafes, we would figure out the total value, land and improvements, was a rule of thumb method, a hundred times a monthly rental, which would indicate a total value there of $60,000, and I feel since the loss of parking, and the reversing of the front door, and *the loss of flow of traffic on Lamar,* and the fact that the restrooms are on the street—(Emphasis mine.)

"Mr. Shurette: Go ahead, sir.

"Q. * * * that it would be most difficult to lease the building and equipment for three hundred a month, and assuming that you could do that, that would indicate a total value there based on ten percent capitalization of approximately $30,000.

"Mr. Shurette: Now, Your Honor, we re-urge our objection because Mr. Cole has testified that he took into consideration the loss of traffic on Lamar Street, which has already been shown to the Court had nothing to do with this condemnation suit, and for that reason, his evidence should be excluded from the jury, and for the further reason that he testified something about having to relocate a door, which there wasn't anything in evidence about. We would like to re-urge our motion that his evidence be stricken from the jury,

and the jury instructed not to consider it for any purpose, because in violation of the court's orders to the counsel for the defendants, the witness has testified about the loss of traffic from Lamar Street.

"The Court: I overrule this motion. *I still have your other motions under advisement.*" (Emphasis mine.)

Mr. Knapp, on cross-examination: "Q. All right, sir. Now, Mr. Knapp, you testified in answer to Mr. McKool's question that the remainder of Mr. and Mrs. Hallum's property was worth $34,000 immediately after it was taken? A. Yes, sir.

"Q. What factors did you take into consideration in arriving at that figure? A. The factors that I considered had to do with, first, the diminution in the utility of the land by virtue of the narrower neck down next to the intersection of Lamar and Wall Street, which was reduced, if I remember correctly, around 16 feet, or approximately 12 per cent of the total width of the lot at that particular point; that it reduced their utility of that particular part because they could not extend any porches or other units on there without danger of encroachment upon the public lands; and on the fact that *the traffic artery, the principal traffic artery which has to do with value of both land and improvements was shifted from one side to the other,* leaving the floor plan of the cafe itself functionally deficient by virtue of the fact that the kitchens, toilet facilities and storage were on the main traffic artery, whereas the main entrance was then on the second artery, rather than the principal artery. (Emphasis mine.)

"Q. What percentage of this loss of $17,250 do you attribute to the changing of what you say, the flow of the traffic? A. The loss in the land value itself, because of the *change of flow of traffic,* and the loss due to the improvements being functionally deficient, would be $13,500. (Emphasis mine.)

"Q. You say it would be $13,500. Now, is that attributed as a result, you say, of switching the traffic flow from one street to the other? A. That is, functional inutility of the facility itself would affect the needs of the restaurant operation by virtue of the fact it was not on the principal thoroughfare.

"Q. What date did you use in arriving at that figure? A. That would be after the date of the taking and with consideration to the fact that the proposed improvement was to be changed.

"Q. Well, how long after the date of the taking? A. Well, it could be immediately after, so long as the purpose for which the taking was established, that the street was to be opened as the principal thoroughfare.

"Mr. Shurette: Now, Your Honor, we would like to renew our objection again to Mr. Knapp's testimony as we have to the others with reference to any damages that might result as a consequence of changing traffic from Lamar Street to Wall Street, because as we have heretofore pointed out, there is no connection between the change of flow of traffic from Wall Street to—from Lamar Street to Wall Street with this particular condemnation suit, it having grown out of a separate and distinct action from the particular suit, and we would also like to point out that Mr. Knapp has testified that of his total damage of $17,250, that he has arrived at, he used $13,500—attributed $13,500 of that to the change of the traffic flow, because he has just testified to such, and we contend the jury should be instructed not to consider any testimony in connection with this change of traffic flow.

"Mr. McKool: If it please the Court, Mr. Knapp didn't say that to start with. He said he attributed the $13,500—I am quoting the words I wrote down—'because of the functional inutility of the building as it was left', and he described what was there on Wall Street, where the airconditioning unit and the other things were on Wall Street and the part of the land that was taken. Your Honor, we have a right to have this evidence shown there. He has placed it upon functional inutility. We have a right to show this. It is indisput-

able in this case that they took so many feet in order to widen Wall Street. No question about that. They were intending to get more traffic in order to widen Wall Street. Otherwise why were they going to widen it?

"Mr. Shurette: Your Honor, I think the record will show that Mr. Knapp's testimony was that he took into consideration the diminution of the nature of the land and the utility and because the traffic flow was changed.

"The Court: Yes; I recall that.

"Mr. Shurette: And the evidence should be stricken from the jury and we so request.

"The Court: Gentlemen of the Jury, disregard the part about the traffic flow.

"Mr. McKool: Note our exception, Your Honor.

"Mr. Shurette: Your Honor, we would also like to have the court instruct the jury that they would disregard any evidence concerning the $13,500 he testified about as a result of this change because there is no evidence in the record to show that the defendants have acquired any property right in Lamar Street, nor any right to keep Lamar Street open, and if he did acquire such a right, it grew out of an independent action, with which this court has no cognizance.

"The Court: I will deny the request at this time." (Although the court in such connection instructed the jury to disregard "the part about the traffic flow," it had theretofore overruled a similar objection and here denies appellant's request for such a jury instruction.)

Witness Cowley, on cross-examination: "A. The difference is that no one sees the front door, as they are going by the property, they can't see the front door or advertising.

"Q. Why can't they see the front door; has the front door been changed? A. It is opposite to where it was so far as the relationship to the traffic is concerned.

"Q. It is opposite to where it was so far as the relationship to the traffic is concerned? A. That is right.

"Q. And you took that into consideration in arriving at your figure of $16,200 loss, is that right, sir? A. *I definitely took into consideration the fact that you couldn't find the front door by driving by the property.*

"Q. Was that the main reason you arrived at that figure of $16,250? A. *That is the reason for arriving at about $12,000 of it.*

"Q. *That is the reason for arriving at about $12,000 of it?* A. *That is right.* (Emphasis mine.)

"Mr. Shurette: Now, Your Honor, we offer the same objection to Mr. Cowley's testimony that we have heretofore offered to the other because by his own statements, he has taken into consideration a change of the flowing of traffic in arriving at the figure he is citing here on damages which he claims is a decreased value of the property in question, of the property that was left remaining after the part was taken, and that this occurrence that he is talking about now has occurred some two years or nearly three years after the taking of November 27, 1951. We again urge the court to instruct the jury to not consider that portion of Mr. Cowley's evidence with reference to the damage sustained as a result of the diversion of the flow of traffic and he has stated that of this $16,250 figure he had in mind, he is attributing at least $12,000 of it to the change in traffic flow.

"Mr. McKool: Your Honor, I think probably that the predicate ought to be laid to ask the witness what caused this, whether it was caused by the condemnation or something else, if it is caused by the condemnation, certainly that is admissible, that is admissible as the elements of damages.

"Mr. Shurette: Now, Your Honor, that is a question of law, the Court has heretofore ruled on the question and has instruct-

436

ed Mr. McKool with reference to these matters; it is not a question of fact for Mr. Cowley or the jury to determine; it is an obvious attempt to inject into a condemnation suit a claim for special damages not growing out of the condemnation suit.

"The Court: I will take your motion under advisement."

Earlier in the trial the court had sustained the motion of City Counsel to exclude the introduction of a moving picture film showing flow of traffic in vicinity of the Hallum property, offered by defendants, taken November 20, 1954; but further ruling as follows: *"The motion of the plaintiff, City of Dallas, to instruct the jury not to consider evidence concerning damages growing out of the closing of any portion of Lamar Street is overruled:* however, the court instructs the attorneys for the plaintiff and the defendant that the attorneys for the property owner may show to the jury the sign there near the intersection of Wall and Lamar Street, which states in effect, 'Closed to through traffic; do not enter.' But the attorney for the property owner or their witnesses cannot elicit any testimony from any witness concerning the fact that Lamar Street has been closed at any place." (Emphasis mine.)

In original opinion, the detail of testimony (Mrs. Hallum) and defendants' offer of Exhibit 23 showing a sign on south of the premises reading "Street closed to through traffic," would lead the reader to conclude that plaintiff's objection thereto was sustained. But such is not the case. Further resistance by counsel to the exhibit and the court's final overruling of all objections is now quoted:

"Mr. Shurette: Judge, we would like to object to the introduction of that picture, because there is no showing here that the Lamar Street has been closed by the side of the Hallum property; we have contended that all along, and if he wants to show that that has been closed all along, he can do that, and if it is not closed at that point, they would not have a right to

claim damages if it were closed in another block in which this property is not situated. And it is our position that the admission of that photograph or any reference to that amounts to giving them the right to prove special damages to which they are not entitled as a result of the closing of Lamar Street at some point distant from the property in question. It would be very prejudicial to the plaintiff to permit the introduction of the picture so as to have the jury believe that we have closed the street alongside of the property that is being condemned. There is no showing here that they do not have the same access that they have always had to Lamar Street, and as a matter of fact, the witnesses heretofore have testified that they do still have the same access from Lamar, Wall, and Grand Street that they have had all along.

"Mr. McKool: I am not trying to show that the street was completely closed.

"The Court: You can show the neighborhood. I will overrule the objection." In the same connection, the City's motion (overruled by the trial court) to "instruct the jury not to consider any evidence concerning damages growing out of the closing of Lamar Street", and naming the witnesses, Mrs. Hallum, Holsomback and Wilson, while perhaps too broad relative to the cross-examination of the latter parties, was surely sufficient as regards Mrs. Hallum; and directly refutes the statements several times made in original opinion that testimony about the closing of Lamar Street and diversion of traffic therefrom *was admitted without objection on part of Counsel for appellant City.*

Here the following observations and conclusions may be stated: (1) That the closing of Lamar Street was first injected into the testimony by defendants on cross-examination of plaintiff's initial witness: "Mr. Burke, do you know whether or not Lamar Street has been changed at all?" (2) That the testimony of Holsomback and Wilson and Mrs. Hallum bore only on the *physical surroundings* of the subject property on date of trial; the Lamar Street

closing and diversion of traffic not coming into the case *as an element of damage* until developed by appellant on cross-examination of defendants appraisers, Cole, Knapp, and Cowley. The latter evidence, therefore, admittedly illegal, *was not of the nature and purport* of evidence earlier "admitted without objection"; the doctrine of waiver, resorted to in original opinion, thereby having no application. (3) The Lamar Street closing was at a point some two blocks distant from the Hallum location. Condemnees were not landowners abutting the street section thus vacated and, therefore, not entitled to claim a *legal injury* not suffered by the public in general; Lee v. City of Stratford, 125 Tex. 179, 81 S.W.2d 1003; Jacobs v. City of Denison, Tex.Civ.App., 251 S.W.2d 804. (4) And aside from the fact that said Lamar closing and diversion of traffic occurred more than two years after the "taking" of November 1951, damages resulting from an exercise of the police power (Dallas City Ordinance of March 1954) must be excluded from any condemnation award. 16 Tex.Jur., p. 449. This statement hardly requires a further citation of authority.

█ Referable to points 2 and 3 of appellant, it is stated in the landmark case of State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194, at page 201, rehearing denied 89 S.W. 2d 979: " * * * If the witness answers that there has been a depreciation or an enhancement in the market value after the taking, in either event it is proper to question him as to the basis of his opinion and the matters he has taken into consideration in arriving at his opinion. If he should testify that among the things he has considered in arriving at his opinion of market value were 'community' benefits or injuries, but that there were other things of a legitimate nature which influenced his

opinion, *this should not invalidate his evidence altogether.* * * * " (Emphasis mine.) Surely under this directive of our Supreme Court, the trial judge should have sustained appellant's objections to that part of the testimony of Knapp, ascribing $13,500 of the Hallum property damage as due to the closing of Lamar Street and diversion of traffic; and to Cowley's testimony attributing $12,000 of damage to a like source. So, also, of the testimony of Cole. Upon objection, a separation of the elements of damage should have been required and that part due to the closing of Lamar Street eliminated; failing which, appellant's objections thereto were good and should have been sustained. The above language of State v. Carpenter does not militate against the exorcising of improper items of damage on timely motion; at least not under the facts and circumstances of this record (See Footnote).*

█ But it may be argued that, curative of all error, was the court's instruction along with issue No. 3, i. e., charging the jury to disregard all evidence of community injury, such as the closing of Lamar Street; they fixing $37,500 as market value of the remaining property after the taking. The instruction reads: "Excluding increase in value, if any, and decrease in value, if any, by reason of benefits and injuries received by defendants in common with the community generally and not peculiar to them and connected with their ownership, use and enjoyment of the remainder of their land, and taking into consideration the use to which the condemned land is to be subjected, what do you find from a preponderance of the evidence was the market value of the remainder of defendants' tract of land immediately after the taking of the land condemned for street purposes.

* Had the improper elements of damage been stricken, the balance of competent evidence would have been insufficient to support the jury answer of $8,000 as damage to the remainder of property in suit. Under Knapp's testimony (excluding the $13,500 attributable to Lamar Street closing), they could have found only $3,750 as defendants' damage; under Cowley's testimony, they could have found no more than $4,250. The City witnesses found that the remaining premises had suffered no damage whatever; and under the testimony of Cole, the legitimate damage, if any, to the remaining property was left largely to conjecture.

We cannot presume that the jury in fact disregarded any decrease in value by reason of injuries suffered by defendants *in common with the community generally* in view of the court's admission in toto of the testimony of Messrs. Cole, Knapp, and Cowley (over reiterated objections); thus impliedly authorizing that fact-finding body to consider the closing of Lamar Street and diversion of traffic as appropriate elements of damage. On the other hand, would not every reasonable presumption be to the contrary?—the incompetent testimony having been paraded before the jury under favorable rulings as to its admissibility. Manifestly, we have here a classic setting for application of Rule 434, T.C.P., of errors committed by the trial court amounting "to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment * * *." This case should be reversed and remanded for another trial.

As the foregoing, together with written concurrence of Chief Justice Dixon, becomes the prevailing opinion on rehearing, these additional conclusions should be noted: Appellant's points 1 and 4 relate to matters that will probably not occur on retrial. The present method of disposition of cause also renders unnecessary any discussion of appellees' cross-point complaining of the trial court's error in failing to allow interest in the judgment at rate of 6% on the sum of $8,796 from November 27, 1951, date of taking by appellant, instead of from November 23, 1953 (date of jury trial).

Our original opinion of affirmance of June 3, 1955, is accordingly withdrawn, motion for rehearing sustained, and this cause is reversed and remanded to the trial court.

DIXON, Chief Justice.

I concur with the views expressed by Justice YOUNG.

Lamar Street was closed about two years after appellant took possession of a part of appellee's property by condemnation. Therefore the closing of the street was not properly an element of damage in the condemnation proceeding. Yet on cross-examination appellee's witnesses testified directly and clearly that they did take the street's closing into consideration in arriving at the amount of damage.

It is true that the closing of the street had been referred to earlier in the trial. But as I read the record this earlier reference was merely by way of picturing the physical setting and historical background of the neighborhood at the time of trial. It was not until counsel for the City cross-examined appellee's witnesses that it was disclosed that the witnesses had included the street's closing as an element in their computation of the damages sustained by appellee. Appellant through counsel then promptly objected and continued to object throughout the rest of the trial, and moved the court to instruct the jury not to consider such evidence. In my opinion the record shows reversible error.

In our original opinion we continued in effect a stay order pending this appeal to enjoin the trial court from further proceeding with a hearing in which appellee sought to obtain a mandamus ordering the City to pay immediately pending this appeal the difference in amount between the Commissioners' award and the amount of the County Court judgment. Appellee had already withdrawn the amount of the Commissioners' award. I think our decision to continue the stay order in effect was proper.

The language of Art. 3268, Vernon's Ann.Civ.St. might lead one to believe otherwise, but the interpretation put upon the statute by our Supreme Court seems to me to support our decision to continue the stay order in effect. Houston Belt & Terminal Ry. Co. v. Hornberger, 106 Tex. 104, 157 S.W. 744. In the above cited case the trial court after first awarding the defendant damages in a condemnation proceeding, changed its mind and dismissed the condemnor's proceeding on the ground that the

condemnation statute was unconstitutional. The condemnor appealed, but the trial court, relying on what is now Article 3268, V.A.C.S., insisted on enforcing its judgment pending appeal by issuing a writ of possession. The Supreme Court in response to certified questions answered that the statute did not deny the condemnor the right to suspend the judgment of the County Court pending appeal, and the Court of Civil Appeals had jurisdiction to enjoin the enforcement of the County Court judgment notwithstanding the statute.

I must further differ with my respected colleague Justice Cramer by saying that in my opinion the cases cited by him, Housing Authority of City of Dallas v. Dixon, Tex.Civ.App., 250 S.W.2d 636, and Thomas v. Housing Authority of City of Dallas, Tex., 264 S.W.2d 93, are not in point. It is true that the language in the Dixon case would seem to support appellee's contention but a careful reading of the whole opinion in the case, and especially a reading of the entire record on appeal, will disclose that the question now before us was not raised by points on appeal or otherwise in the Dixon case, and was not before the court at all.

Thomas v. Housing Authority of City of Dallas, Tex., 264 S.W.2d 93, had to do only with the right of a landowner to withdraw the amount of the Commissioners' award and continue to litigate the case in County Court and on appeal. Here is what the Supreme Court said: "This case presents but one question and that is: Can the landowner, who has filed objections to the award of the Commissioners in a condemnation proceeding, and who has been properly dispossessed by condemnor withdraw the amount of the award, and further prosecute his suit? We hold that he can and that he has not waived his right to prosecute his appeal by drawing down the amount awarded by the Commissioners." The question now before us was not before the Supreme Court and was not passed on in the Thomas case.

On rehearing the judgment of affirmance heretofore entered will be set aside and the judgment of the trial court will be reversed and remanded for another trial. Our stay order will remain in effect pending further proceedings on appeal.

CRAMER, Justice (dissenting).

I find I am unable to agree with my associates in their disposition of this cause.

This is a condemnation proceeding by appellant City against appellee Hallum and wife as owners, and the American National Bank of Oak Cliff as a lien-holder, involving the fee simple title to a strip of land off the Wall Street side of appellees' property bounded by Lamar Street, Wall Street, and Grand Avenue, to widen Wall Street in connection with the Central Expressway-Wall Street Connection where Lamar Street and Wall Street angle together and merge in appellant City.

The trial court duly appointed Commissioners who assessed the damage and from their award appellees filed objections and duly appealed to the County Court of Dallas County at Law No. 1. The City then placed in the registry of said County Court the amount of the Commissioners' award, $3,500, and entered into possession of the land and has remained in possession down to date. Shortly after such deposit, appellees withdrew the same and are still in possession of such deposit. On a trial in the County Court of Law No. 1, the value of the land taken was found by the jury to be $4,296 and the damages to the land not taken to be $8,000. The trial court entered judgment on the verdict for $12,296, costs, etc., and this appeal has been duly perfected from that judgment, and appellant City briefed four points of error.

Point 1 asserted error in overruling its objection to a motion to instruct the jury to disregard evidence given by the witnesses Maxine Hallum, Lee N. Holsomback and L. E. Wilson as to damages growing out of the closing of Lamar Street. This point was countered in substance that there was no error in overruling appellant's motion since (a) the motion was too broad and was to include all evidence on cross-

examination given by the named witnesses; (b) motion was not made until the third day after the trial and after all the evidence had been admitted without objection by appellant; (c) motion was made after the City had brought out and developed nearly all this evidence; and (d) trial court ruled that no testimony would be admitted concerning the fact that Lamar Street had been closed at any place.

The statement of facts discloses that Lee Holsomback, an expert witness on real estate values, material here, testified on direct examination that while employed by the City he examined this property, attempted to negotiate with the Hallums to acquire the strip necessary for widening Wall Street; detailed his investigation around this property and values in the vicinity; then gave his opinion that the land taken, considered as severed land, was of a reasonable cash market value on March 27, 1951 (3148 sq. ft.) of $3050 and the improvements taken worth $200. He also testified the value of the part not taken before the taking was $15,946.60 for the land and after the taking was $17,406.50; that the value of the buildings before the taking was $27,000; the value after the taking was $26,800.

The witness L. E. Wilson, a realtor, testified that he had handled, in the last few years, largely business property, some residential and suburban property; that he was a member of the Dallas Real Estate Board and the State Board; that he appraised the property in question as follows: The land taken by the City (2163 sq. ft.) was at the time of the taking worth $1.50 per sq. ft., totaling $3,245; that the land was not of such shape that he could put a front-foot value on it,—only a sq. ft. value; that the value of the remainder of the land was of a reasonable cash market value of $1.50 per sq. ft.; further testified he was of the opinion that the value per sq. ft. after the taking was more than it was before the taking. He testified that he gave evidence more for condemnors than for condemnees; testified on cross-examination by appellees' attorney without objection that the front of this drive-in fronts on and

faces Lamar Street; that the more traffic passing in front of the property, the more trade they would have, the better the property is for a drive-in, and the more valuable it is for their purpose; that prior to the taking here Lamar was a very heavy street insofar as traffic is concerned; and as follows:

"Q. Now, would you tell the jury what the flowage of traffic is on it now? A. Well, Lamar Street is dead-ended, they closed it at the railroad.

"Q. It is dead-ended? A. Plenty of traffic on Wall Street; more on Wall Street, in my opinion.

"Q. All right. Now, the deadend is just about a quarter or half block north of Grand Avenue, isn't it? North of the tracks? A. Well, I would say it is a good long block.

"Q. Now, is there a sign there on this block anywhere telling the traffic that the street is closed? A. Yes, sir.

"Q. There is a sign there? A. Yes, sir.

"Q. And does that affect the traffic going into Lamar Street? A. Sure, it affects the traffic going into Lamar Street.

"Q. That practically seals the traffic from flowing on Lamar Street? A. The through traffic, yes, they don't go up Lamar Street." He had only appraised the land, not the buildings. He further testified that the bulk of traffic now flows on Wall Street, the east side of the Hallum property instead of the west Lamar Street side; that traffic devices have now been installed on Wall Street; that automobiles drive in and park at the same place they were parking before, except for that portion taken by the City. There was a curb line, but no side walk on Wall Street before this project was commenced; the curb is still there, but moved back, and there is now a side walk on the Wall Street side.

Mrs. Hallum, an appellee, and wife of E. P. Hallum, testified in substance that she and her husband are owners of Cow-

boys Restaurant on South Lamar; they acquired it in 1945; it is open for business 24 hours a day; is presently a drive-in; building faces on Lamar; and as follows:

"Q. Have any customers ever come in through the Grand Avenue side or the Wall Street side since you have had the place, Mrs. Hallum? A. I have never had the door unlocked on the Wall Street side, and never had a customer come through; I do have customers come through from the Grand Avenue side, but not the Wall Street side."

The witness also testified:

"Q. Now, Mrs. Hallum, before the taking in this case, where did your traffic flow around your place of business? A. Mostly on Lamar Street.

"Q. On Lamar Street? A. Yes, sir.

"Q. All right, if you look at it, this map here, then the traffic flowed on Lamar Street, is that right? A. Yes, sir.

"Q. That was before the taking? A. Yes, sir.

"Q. Now, before the taking, Mrs. Hallum, could you tell the jury approximately how many customers you had in your place of business prior to the taking on the average per day prior to the time of taking? * * * A. I had eight to nine hundred a day.

"Q. Eight to nine hundred? All right, now, Mrs. Hallum, after the taking in question, did the traffic continue to flow on Lamar Street as it did before? A. No, sir.

"Q. Where did the traffic flow? A. Down Wall Street.

"Q. On the back of the property on Wall Street, is that right? A. That is right.

"Q. All right, are there any signs on this block anywhere that tell the people that the street is open or closed? A. Yes, sir.

"Mr. Shurette: Now, your Honor, we object to such a question as that because it is not shown for what purpose he is attempting to show the sign, and we would like to discuss it with the Court, if the Court sees fit.

"The Court: All right, come on up. (Discussion at the Bench, outside the hearing of the Reporter.)

"Q. (By Mr. McKool): I show you what has been designated as Exhibit No. 23 and ask you if that accurately and correctly portrays the front of your property before you get to it there at Lamar and Wall Street? A. Yes, sir.

"Q. And does that accurately and correctly portray the signs there? A. Yes, sir.

"Q. That has been accurately portrayed that way since the time of the taking? A. Yes, sir.

"Mr. McKool: We introduce in evidence the defendant's Exhibit No. 23.

"Mr. Shurette: Now, your Honor, we object to the introduction of this out of this picture with reference to the sign, because of the statement that it has been there ever since the date of the taking. I have said before we would like to discuss it, and we would like to have our bill with reference to this—the introduction of this picture.

"The Court: All right, step outside in the hall, Gentlemen of the Jury. You will have time to go get a coke.

"Mr. Shurette: Do you want us to dictate our bill?

"The Court: Well, I want to hear some discussion about it first; I think that the objection made about 'since the date of taking' is a good objection. I don't believe this sign has been there since November 21, 1951."

There is no question but that Lamar Street was closed about a city block from the property in question sometime after the

condemnation and the taking of the strip of land. The evidence of the closing of Lamar Street would not have been admissible if proper objection had been made when it was first offered, involving, as it did, only compensation and damages at the time of the taking. The point and counterpoint raise only the question of whether or not the error in the court's ruling was rendered harmless by other similar evidence in the record theretofore admitted without objection. In my opinion it was. In 27 T.L.R. 708, Reversible Error in Texas Civil Procedure, the writer, in my opinion, properly concluded (at page 712) that: "From a review of the cases construing Rules 434 and 327, it appears that the Supreme Court has gone far toward bringing litigation to a speedy and just conclusion by conditioning reversal upon a showing by the appellant that injury probably resulted to him from the error, even in instances where previously the doctrines of 'reasonable doubt' and 'presumed harm' obtained." See also Ball v. Yowell, Tex.Civ.App., 222 S.W.2d 277, error ref. n. r. e.; Steinke v. Schmid, Tex.Civ.App., 223 S.W.2d 955; Rowe v. Liles, Tex.Civ.App., 226 S.W.2d 253, error ref.; Shock v. Mrs. Ragsdale's, etc., Tex.Civ.App., 228 S.W.2d 353, ref. n. r. e. Point 1 should have been overruled.

Point 2 asserted error in allowing, over appellant's objection, the witnesses Cole, Knapp, and Cowley to testify concerning the diversion, or loss of flow of traffic, as an element of damage in arriving at the value of the land taken and damages to the remainder after the taking. This point was countered that the trial court did not err in allowing these witnesses to testify as to the functional utility of the property in question and the flow of traffic on Wall Street as a result of the combination in question. Cole, Knapp and Cowley testified after the witnesses Hallum, Holsomback and Wilson. Cole, that he was a real estate broker and appraiser and had been since July 1949; was a member of the Dallas Real Estate Board; that he made an inspection and appraisal of the property

in question, and after testifying to numerous specific facts regarding the value of this property, placed the reasonable cash market value of the strip of land on Nov. 27, 1951 at $4,296; the value of the total property here involved on that day at $58,926; and value of all the land, less only the strip taken by the City, at $54,630; that after the taking the remainder, considering the use to which the strip taken was to be used by the City, etc., was of a reasonable market value of $30,630, and the severance damage to be $24,000; he based such estimate on the fact that the property can no longer be put to its best use, resulting from loss of access to the property; that is, that it fronts on a dead-end street; resulting in a loss of flow of traffic on Lamar Street. The court sustained the objection to that portion of the answer as to loss of flow of traffic on Lamar Street and instructed the jury to disregard the answer. The statement of facts shows that the following took place:

"Q. (By Mr. McKool) Does that sign being there have any effect upon the access or the flow of traffic into the property in question? A. It does.

"Mr. Shurette: Now, your Honor, we offer the same objection to this photograph that we offered to the other, that it has been shown that the photograph was—the sign he refers to was placed there as a result of an action not connected with this condemnation suit.

"Mr. McKool: I understood you to rule that was all right, Judge.

"The Court: Yes, I will overrule the objection.

"Mr. McKool: Thank you, sir.

"Mr. Shurette: We would like to point out further that the sign was not here; the evidence by his own witness is to the effect that the sign was not there when the tract of land was severed, when the City of Dallas took it, it shows a condition different from the date of taking.

"The Court: Overruled."

In my opinion it would have been error to admit in evidence the testimony with reference to the closing of Lamar Street to traffic if proper objection had been made when the matter was first offered in evidence since other portions of the record show that Lamar was not closed until after the property was taken by the City. The evidence, although not, on proper objection, admissible, was first admitted here without objection by the City. The evidence being before the jury without objection, its admission later, over objection, was harmless unless the cumulative effect was of such a nature that, notwithstanding the prior evidence, it itself in some material way directly affected the verdict. In my opinion, taking all the evidence together, the evidence admitted without objection and its effect on the jury made harmless the evidence afterward admitted as shown by the record here. Turner v. Hodges' Estate, Tex.Civ.App., 219 S.W.2d 522. Point 2 should have been overruled.

Point 3 asserted error in admitting over its objection, in connection with the closing of a portion of Lamar Street, evidence on damage to the remainder of the property, when the closing of Lamar Street was not a part of this condemnation proceeding, but a separate and independent act of the City which occurred more than two years after the date of the taking in November 1951, and the trial court had no jurisdiction to award damages for said closing in this condemnation suit or any other suit in this court. Point 3 is countered that appellant City brought out and developed most of the evidence pertaining to the closing of a portion of Lamar Street, and the trial court therefore did not err in admitting in evidence over appellant's objection such evidence in connection with the closing of a part of Lamar Street to prove damages to the remainder of appellees' property. The record shows, as heretofore stated under other points, that the evidence here complained of was admitted without objection and we cannot hold that the evidence here complained of added to or took from the evidence already before the jury without objection. The admission of the evidence complained of, over objection, after other evidence of the same nature and purport had been admitted without objection, was not under the record here reversible error. City of Teague v. Stiles, Tex.Civ.App., 263 S.W. 2d 623, ref. n. r. e. Point 3 should have been overruled.

Point 4 asserts error in allowing appellees' witness Cole to testify as to the value of the property taken and as to the value of the remainder when such witness's testimony was based on the value as of Dec. 1953, when the land was in fact appropriated in Nov. 1951. The point is countered that the court did not err in allowing the witness to so testify since Cole based his evidence of value as of November 1951. Cole, as an expert witness, testified that he knew the reasonable cash market value of the land taken by the City on Nov. 27, 1951, and that it was $4,296; that the value of all the land and all the improvements on Nov. 27, 1951 was $58,926 and the value of all land and improvements exclusive of the strip condemned immediately before the strip was taken for street purposes on Nov. 27, 1951, was $54,630, and excluding the increase in value, if any, and decrease in value, if any, by reason of benefits or injuries received by the defendants in common with the community generally and not peculiar to them and connected with their ownership, use, and enjoyment of the particular tract of land and all of the improvements located thereon, across which the strip of land has been condemned, and taking into consideration the uses to which the strip condemned is to be subjected, that the reasonable cash market value of the remainder of defendants' land and all of the improvements located thereon immediately after the taking of the strip condemned for street purposes, was $30,630. After Mr. Cole gave the above testimony in answer to a question propounded to him by Mr. Shurette on cross-examination, Mr. Cole replied that the date of taking was in December 1953. The questions propounded to Mr. Cole were as follows:

"Q. All right, sir, at what figure, how did you arrive at that figure? A. $2.00 a square foot.

"Q. $2.00 a square foot. All right, sir. Now, at what time,—at what date did you use in arriving at your value of $2.00 a square foot? A. I used the date at the time it was taken there.

"Q. Well, do you know what the date of the taking was? A. It was in December of 1953." Thereupon, Mr. McKool, attorney for appellees, stated to the Court: "I know but I asked him the question as of November 1951, he gave me an answer to that date. There is a conflict that needs to be straightened out." Mr. Cole tried to explain this conflict and when Mr. Shurette asked him what date he used in arriving at his figure of $54,630, he replied: "That was in November 1951. I would like to make a statement if I may." Then, when Mr. Cole was asked by Mr. Shurette why he did use the date of December 1953, Mr. Cole replied: "Because it was in December of 1953 that it was actually completed through there and that is why I brought that date into it." On redirect examination, the following questions were propounded to Mr. Cole:

"Q. Mr. Cole, the figure that you gave about the value of this tract, the strip that they took, was that based upon the value as of November 1951, that is what it was worth at that time, that they took it? A. Yes, sir, that is right.

"Q. And it was worth $4,296 on November 27, 1951, being the date that they took the property? A. That is right. * * *

"Q. (By Mr. McKool) Tell the jury as to what date you figured on the value of the whole thing exclusive of this strip prior to the taking, what did you use? A. November 1951.

"Q. All right, now, do you know approximately when the street here, the land here, was actually taken and the street was opened on Wall Street? A. Yes, sir, I do.

"Q. When was that, sir? A. That was in December of 1953.

"Q. Was that where the complication came in with the question you were asking him? A. Yes, sir.

"Q. All right, now, as of—

"Mr. McKool: Well, Judge, we had to straighten up the confusion.

"Mr. Shurette: Well, he has gotten himself confused, not us.

"Q. (By Mr. McKool) All right. Now, Mr. Cole, as of November 21, 1951, knowing that this land was going to be taken, and knowing what the best use of the property was going to be, and what the situation is after that as of that date, what is the value of the remainder of the property as of that date of November 27, 1951? A. $30,630.

"Q. All right, and in your opinion, you said that is the value—that date—in your opinion, is that still the value today? A. Yes, sir.

"Q. So, in your opinion, it still has practically the same value today as then? A. That is true."

On the record, point 4 was properly overruled.

The present majority opinion does not pass on appellees' counterpoint which complains of the disposition of appellant's preliminary motion or application for a stay order to prevent appellee landowner from enforcing the County Court judgment for the difference between the amount of the award of the Commissioners and the judgment of the County Court, pending this appeal, which motion was passed and thereafter considered with the merits.

What this Court said in Housing Authority of City of Dallas v. Dixon, 250 S.W.2d 636, syls. 2, 3, at pages 637–638, error ref. n. r. e., is controlling here. See also Thomas v. Housing Authority of City of Dallas, Tex., 264 S.W.2d 93, on the property owner's right to further prosecute

his suit after withdrawing the amount of the Commissioners' award.

Art. 3268, V.A.C.S., provides in its last paragraph that "If the cause should be appealed from the decision of the county court, the appeal shall be governed by the law governing appeals in other cases; except the judgment of the county court shall not be suspended thereby." The legislative purpose and intent in Art. 3268 was to allow immediate possession of the land sought to be condemned, if, and only if, the Constitutional prohibition, Const. Art. 1, sec. 17, Vernon's Ann.St., against taking before payment is met, and therefore to permit the enforcement of the County Court judgment, less the amount theretofore paid on the Commissioners' award, pending further appeal, if the condemnor desires to remain in possession, the condemnor should pay the amounts set by the trier of the facts before the condemnor could further hold possession pending final determination of the correct amount. This is shown by another provision in Art. 3268 which provides that in addition to the provision that the County Court judgment shall not be suspended by an appeal, that "where the award paid the defendant or appropriated by him exceeds the value of the property as determined by the final judgment, the court shall adjudge the excess to be returned to the plaintiff."

A careful reading of the Hornberger case, cited by the City, will disclose that it is not in point. The Hornberger case is between a judgment for damages as here, and a judgment in favor of the landowner for possession of the land based on findings of no right in condemnor to condemn the property. The Hornberger holding does not in any way conflict with the holding in the Dixon case to the effect that payment is a prerequisite to a taking and holding, and allows the drawing down of the deposit with the Clerk before final judgment, when a final adjustment of the damages is finally made, as provided in the statute.

I therefore respectfully dissent to the holding in the original opinion and in the substituted opinion by Justice YOUNG on the motion to require appellant City to pay the amount of the trial court judgment, since at the time of such judgment appellant had theretofore taken, and was in possession of, the land sought to be condemned, and was refusing to pay the full amount of damages fixed by the judgment then in effect.

In my opinion, the mandamus should have issued commanding appellant City to either pay the County Court judgment or return the land to appellees, pending further orders of the court, or final judgment in the cause.

Believing that the judgment of the trial court should have been affirmed, I respectfully dissent from the judgment reversing and remanding this cause for a new trial on the merits. I further dissent from the implied holding in the opinion by Justice YOUNG and the concurring opinion by Chief Justice DIXON for the reason that the preliminary motion should have been sustained and the judgment of the trial court enforced by proper process, pending final judgment which would, of course, conform to the provisions of Art. 3268, V.A.C.S., which provides that the County Court judgment is not suspended by this appeal.